UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENERAL MEDICINE, P.C.,

    Plaintiff,

                                  Case No. 24-cv-12713

v.                               Hon. Matthew F. Leitman

SECRETARY OF THE U.S. DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

    Defendant.

_____/

## ORDER (1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 14) AND (2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 16)

Plaintiff General Medicine, P.C. provides healthcare services to patients enrolled in Medicare. In 2010, a Medicare contractor determined that the Medicare program had overpaid General Medicine by over $800,000.00 for services that General Medicine provided to Medicare patients in Louisiana. General Medicine then challenged that overpayment determination before an Administrative Law Judge (the "ALJ"). The ALJ agreed with the contractor's conclusion that General Medicine had been overpaid on some claims and disagreed with the contractor's conclusion that General Medicine had been overpaid on others. The ALJ directed the contractor to recalculate the overpayment amount based upon his (the ALJ's) evaluation of the claims. (*See* ALJ Ruling, ECF No. 13, PageID.377-491.)

In this action, General Medicine seeks judicial review of certain portions of the ALJ's ruling that were adverse to General Medicine.  It asserts that those portions of the ruling were tainted by several errors. (*See* Compl., ECF No. 1; General Medicine Mot., ECF No. 14.)  Now pending before the Court are cross-motions for summary judgment that General Medicine and Defendant Secretary of the United States Department of Health and Human Services (the "Secretary") have filed. (*See* Mots., ECF Nos. 14, 16.)  The Court held a hearing on the motions on January 20, 2026.  For the reasons explained below, the Court **GRANTS** the Secretary's motion and **DENIES** General Medicine's motion.

**I**

Before turning to the facts of this case, the Court pauses to review the relevant Medicare audit and appeal procedures that were employed here.  In *General Medicine, P.C. v. Azar*, 963 F.3d 516 (6th Cir. 2020), the Sixth Circuit provided the following helpful summary of those procedures:

> Medicare is a federally subsidized health insurance for the elderly and those with disabilities. 42 U.S.C. § 1395 *et seq*. The Secretary of the U.S. Department of Health and Human Services ("Secretary") acts through the Centers for Medicare and Medicaid Services ("CMS") to administer Medicare. *Id.* § 1395hh(a)(1). CMS contracts with private entities, known as Medicare Administrative Contractors ("CMS contractors"), to help administer the program, including investigating fraud and abuse. *Id.* §§ 1395kk-1, 1395ddd.

CMS contractors may conduct a post-payment audit of providers to ensure that the Medicare services that providers are billing are medically necessary and meet the requirements of the Medicare program. *See id.* § 1395ddd(b). In a post-payment audit CMS contractors review a random sample of a provider's Medicare claims. *See id.* § 1395ddd(f)(4). CMS contractors will review the records and then calculate an error rate based on the review. If there is a sustained or high level of payment error, the CMS contractor will extrapolate that error rate over the provider's total Medicare claims to determine a total amount of overpayment. *See id.* § 1395ddd(f)(3).

If a provider objects to the CMS contractor's overpayment determination, there are four levels of administrative review that the provider can pursue: (1) redetermination by the Medicare Administrative Contractor; (2) reconsideration by a Qualified Independent Contractor; (3) a hearing before an Administrative Law Judge; and (4) review of the Administrative Law Judge's decision by the Medicare Appeals Council. *See id.* § 1395ff; 42 C.F.R. §§ 405.900–405.1140. After exhausting all four levels of administrative review, the provider can seek judicial review in a federal district court. 42 U.S.C. § 1395ff(b)(1)(A).

*Id.* at 518–19.

## II

The Court now returns to the facts and procedural history of this case. In brief, between 2004 and 2006, General Medicine provided medical services to "residents of long-term care facilities located in Louisiana." (Compl. at ¶ 10, ECF No. 1, PageID.3.) Medicare insured many of those patients. As Medicare participants, those patients did not pay General Medicine directly for the services General

Medicine provided. Instead, the patients assigned to General Medicine the right to payment from Medicare. *See* 42 C.F.R. § 424.55.  General Medicine then submitted claims for payment directly to Medicare, and Medicare paid General Medicine directly for those services. *See* 42 C.F.R. § 424.55(a).

In 2010, AdvanceMed, a contractor for the Centers for Medicare and Medicaid Services ("CMS"), conducted an "audit" of 90 randomly-selected claims that General Medicine submitted for payment to Medicare. (ALJ Dec., ECF No. 13, PageID.377.)  The claims arose out of services that General Medicine provided to Medicare beneficiaries in Louisiana from January 1, 2004, through April 30, 2006. (*See id*.)  Based on its review, AdvanceMed concluded that 91% of those claims were either overbilled or not entitled to payment at all. (*See* 2/22/2010 AdvanceMed Ltr., ECF No. 13-1, PageID.1736.)  It therefore determined that Medicare had overpaid General Medicine in the amount of $4,185.27 on those 90 claims. (*See* Admin. R., ECF No. 13-1, PageID.983.)  AdvanceMed then extrapolated that rate of error across all of General Medicine's claims during the relevant time period and came to a final overpayment determination of $804,653.00. (*See* 2/22/2010 AdvanceMed Ltr., ECF No. 13-1, PageID.1738; ALJ Dec., ECF No. 13, PageID.377.)

General Medicine then sought administrative review of AdvanceMed's overpayment determination.  Following several administrative appeals and a remand

for further consideration that this Court ordered, the ALJ held a hearing on General

Medicine's challenge to AdvanceMed's overpayment determination on April 8,

2024.

On May 24, 2024, the ALJ issued a written decision that was partially

favorable to General Medicine. (*See* ALJ Dec., ECF No. 13, PageID.377-491.)  At

the time of the ALJ's decision, 75 claims remained in dispute.  Based on his review

of each of those claims, the ALJ concluded that 19 claims were properly paid in full,

22 claims should have been paid at a lower billing rate, and 36 claims should not

have been paid at all. (*See id.*)  The ALJ then directed AdvanceMed to "recalculate

the [overpayment] amount" based on his ruling. (*Id.*, PageID.491.)

On July 10, 2024, General Medicine sought review of the ALJ's decision with

the Medicare Appeals Council. (*See* Admin. R., ECF No. 13, PageID.229.)  After

that body failed to issue a timely decision on the appeal,[1] General Medicine filed this

action in which it seeks judicial review of the ALJ's decision. (*See* Compl., ECF No.

1.)  General Medicine contends that the ALJ made five separate errors in reaching

his decision.  The Court will discuss the ALJ's decision and General Medicine's

specific claims of error in much more detail below.

---

[1] Pursuant to 42 C.F.R. § x405.1100(c), the decision of the Medicare Appeals Council was due on October 8, 2024.  The Appeals Council did not issue a decision by that deadline. (*See* Admin. R., ECF No. 13, PageID.226-227.)  The Appeals Council's failure to issue a decision by that date authorized General Medicine to seek relief in this Court. *See* 42 C.F.R. § 405.1132(a).

## III

Now before the Court are the parties' cross-motions for summary judgment. In its motion, General Medicine asks the Court to "reverse the decision of the ALJ" and remand this action for further administrative proceedings. (General Medicine Mot., ECF No. 14, PageID.13424.)  In the Secretary's motion, he says that because General Medicine's arguments all lack merit, the Court should affirm the ALJ's ruling. (*See* Secretary Mot., ECF No. 16, PageID.13466.)  The Court will therefore focus on General Medicine's claims of error in its analysis below.

In reviewing the motions, the Court's task is limited to determining whether "the administrative ruling was supported by substantial evidence and whether proper legal standards were employed." *General Medicine, P.C.*, 963 F.3d at 520 (cleaned up). "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* "If there is substantial evidence to support the decision, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (internal citation and punctuation omitted).  "Whether the [ALJ] made an error of law in applying a statute, however, is reviewed *de novo*." *Id.*

## IV

## A

General Medicine first argues that the ALJ erred when he failed to (1) require the production of audit scoring worksheets that AdvanceMed created and used when making its overpayment determination and (2) grant General Medicine an adverse inference based upon the fact that neither AdvanceMed nor CMS produced the worksheets. (*See* General Medicine Mot., ECF No. 14, PageID.13403-13408.)  The Court declines to grant General Medicine relief on this argument.

## 1

The Court begins with a bit of background on the Medicare billing process, claims audit process, and the role of audit scoring worksheets.  When a Medicare provider like General Medicine submits a claim to Medicare for payment, the "claim includes various information, including where the medical service was provided, the dollar amount being billed to Medicare, and an identification number for the health care provider. It also contains a code for the procedure or service performed and the level of complexity involved." *United States v. General Medicine, P.C.*, No. 22-cv-651, 2023 WL 6216961, at * 2 (S.D. Ill. Sept. 25, 2023).  "These codes are called the 'CPT codes' which stands for Current Procedural Terminology codes. CPT codes are a national uniform coding structure created for use in billing and overseen by the American Medical Association. CPT codes are used by all health insurance

7

companies and by Medicare." *Id.* The Medicare program pays the provider based, in part, upon the CPT code for the service provided to the Medicare patient.

When a Medicare contractor conducts an audit of a provider's claims, one of the tasks that the contractor performs is to determine whether the services provided meet the requirements of the CPT billing codes. According to General Medicine, when Medicare contractors perform that task, they "routinely use standard audit scoring worksheets to arrive at their coding determinations." (ALJ Dec., ECF No. 13, PageID.392.) During the hearing before the Court, General Medicine further explained that in related litigation in the United States District Court for the Southern District of Illinois, it learned that AdvanceMed, in fact, used such worksheets when arriving at its overpayment determination in this case.

**2**

General Medicine says that AdvanceMed did not produce the worksheets to General Medicine at the time that it made the overpayment determination. General Medicine contends that it needed access to those worksheets in order to understand and "confirm how [AdvanceMed] arrived at its conclusions." (General Medicine Mot., ECF No. 14, PageID.13404.) General Medicine insists that "withhold[ing] such evidence improperly prevent[ed] [it] from" having the information necessary to "challeng[e] [AdvanceMed's] decision." (*Id.*, PageID.13405.)

**3**

During the proceedings before the ALJ, General Medicine asked the ALJ to compel AdvanceMed to produce the worksheets – and to do so before the ALJ convened the hearing. (*See* ALJ Dec., ECF No. 13, PageID.393.)  General Medicine argued to the ALJ that it had a right to receive the worksheets under two federal regulations.  First, General Medicine contended that production of the worksheets was required under 42 C.F.R. § 405.921(b)(2)(i) ("Section 921"). (*See id.*)  Section 921 provides that "[t]he notice of initial determination must contain …  the basis for any full or partial denial determination of services or items on the claim." 42 C.F.R. § 405.921(b)(2)(i).    General Medicine argued that Section 921 compelled AdvanceMed to produce the worksheets because those worksheets "are precisely what form 'the basis' for [AdvanceMed's overpayment] determination." (General Medicine Mot., ECF No. 14, PageID.13406.)

Second, General Medicine argued that it had a right to the worksheets under 42 C.F.R. § 405.1042(a)(2) ("Section 1042"). Section 1042 provides that the administrative record before the ALJ shall include "the appealed determination, and documents and other evidence used in making the appealed determination." 42 C.F.R. § 405.1042(a)(2).   General Medicine asserted that because "the audit worksheets are unquestionably documents used in making the 'appealed

9

determination' . . . [the] worksheets must be part of the administrative record." (General Medicine Mot., ECF No. 14, PageID.13406.)

General Medicine finally argued to the ALJ that if the worksheets were not produced before the hearing, then the ALJ should grant General Medicine "an adverse inference that the information contained in the missing worksheets would have been favorable to [General Medicine]." (ALJ Dec., ECF No. 13, PageID.393.)

The ALJ rejected General Medicine's arguments that it had a right to worksheets. He explained his ruling as follows:

> The Appellant contends that Medicare contractors routinely use standard audit scoring worksheets to arrive at their coding determinations, and although the contractors have provided the Appellant their conclusions, they have not provided the audit scoring worksheets that confirm how the Contractor arrived at its conclusion and what is missing from the history areas, physical examination systems, diagnosis/treatment options, risk of complication, and amount and complexity of data. (Exh. 5, pp. 10-13). The Appellant further contends that the worksheets should be provided before the appeal is decided and cites 42 C.F.R. § 405.921(B)(2)(I) for the proposition that the audit worksheets at issue are precisely what form "the basis" for the determination. (*Id*.) Section 405.921(B)(2)(i) states that "The notice of initial determination must contain all of the following: (i) The basis for any full or partial denial determination of services or items on the claim."
>
> I disagree with the Appellant's interpretation of the provision and that it would require that the Contractor provide its scoring worksheets used in preparation for its coding determinations. A review of the determinations from the Contractor and the QIC show that they contained

10

"[t]he *basis* for any full or partial denial determination of services or items on the claim." (Exh. 1, pp. 176-206, 1020-1026, 1028-1037). These decisions contained the reasons for denial, and with regard to the coding determinations, a description of the type of history, type of exam, and type of medical decision making for each beneficiary. *(Id.)* Although I agree that submission of the worksheets could be helpful to the Appellant, I do not believe their submission is required, and the Appellant has not cited any authority to support it. Accordingly, I find that the argument lacks merit.

(*Id.*, PageID.393-394.)[2] Because the ALJ concluded that General Medicine did not have a right to the worksheets, he declined to grant General Medicine an adverse inference based upon the non-production of the worksheets.

**4**

In this Court, General Medicine renews its arguments that it had a right to the worksheets under Section 921 and Section 1024, and General Medicine contends that the ALJ erred in ruling to the contrary. The Court addresses each argument below.

The Court begins with General Medicine's argument that AdvanceMed was required to provide the worksheets under Section 921 because the worksheets formed the "basis" of AdvanceMed's overpayment determination. The Court disagrees. The "basis" of AdvanceMed's overpayment determination, as that term

---

[2] While the ALJ's ruling only addressed General Medicine's argument under Section 921, General Medicine has identified evidence in the administrative record that it raised its arguments under both Section 921 and Section 1042 before the ALJ.

11

is used in Section 921, is most naturally understood to mean the "reason for" the determination. *See, e.g., Beck v. Shinseki*, No. CV 113-126, 2015 WL 1202196, at *26 (S.D. Ga. Mar. 16, 2015) (explaining that the term "basis" – as used in a federal statute requiring a notice of disciplinary charges to identify "the basis for each charge" – "merely means a reason" or a "foundation or starting point") (internal citation and quotation marks omitted). And as the ALJ correctly concluded, AdvanceMed provided that reasoning to General Medicine. Its overpayment determination included "the reasons for denial, and with regard to the coding determinations, a description of the type of history, type of exam, and type of medical decision making for each beneficiary." (ALJ Dec., ECF No. 13, PageID.394.) Simply put, AdvanceMed provided the "basis" of its overpayment determination when it identified the claims that had been overpaid and identified the CPT code at which the services on each claim should have been billed, but were not. While the worksheets may have been helpful in providing a fuller understanding of AdvanceMed's analysis and conclusions, the worksheets themselves were not the "basis" on which AdvanceMed made its overpayment determination. Thus, production of the worksheets was not required under Section 921.

The Court next turns to General Medicine's argument that Section 1042 required AdvanceMed to produce the worksheets. This argument proceeds in two steps:

12

- Step one: Section 1042 requires the administrative record to include "the appealed determination and documents and other evidence used in making the appealed determination." 42 C.F.R § 405.1042(a)(2).

- Step two: The worksheets had to be included in the administrative record because they are "documents" that AdvanceMed "used in making the appealed determination" (*i.e.*, the overpayment determination).

This is a serious argument. Indeed, it would appear to be technically accurate to say that the worksheets are "documents" that AdvanceMed "used" in "making" its overpayment determination. AdvanceMed presumably created the worksheets and then reviewed the contents of the worksheets – thereby "using" the worksheets – in the process of determining whether General Medicine had been overpaid.

But Court must reject General Medicine's argument because Section 1042 does not require that the administrative record include *every* document "used" *in any way* to make an overpayment determination. *See Calvary Hosp. Inc. v. Becerra*, 762 F.Supp.3d 360, 376 (S.D.N.Y. 2025) (rejecting argument that Section 1042 "require[s] the ALJ to obtain and include in the administrative record every single document that any Medicare contractor used" in reaching its conclusions). Instead, Section 1042 requires that the administrative record include documents that were "used" by the Medicare contractor *as evidence* in the claims review process. This conclusion follows from the plain language of Section 1042. That regulation does

not state that the administrative record must contain the "documents used in making the appealed determination." Rather, it provides that the record must include the "documents *and other evidence* used in making the appealed determination." (Emphasis added.) The reference to "other evidence" immediately after the term "documents" signals that the relevant documents include only those used *as evidence* by the Medicare contractor in the process of making the overpayment determination. *See Salazar v. Paramount Global*, 133 F.4th 642, 650 (6th Cir. 2025) (explaining that under "the word-association canon" of construction, "a general word can be limited by its connection to other words in the same text").[3] Such relevant documents would include, for example, patient charts, provider notes, and medical test results because those are the types of documents that contain evidence on which an overpayment determination is based. The worksheets, in contrast, are notes that the Medicare contractor made based upon its *review* of the evidence; the worksheets themselves are not evidence that the contractor used.

An analogy to summary judgment practice in this Court helps to confirm the point. When the Court reviews a motion for summary judgment, the Court reviews the deposition transcripts and affidavits submitted with the motions, and the Court

---

[3] While Section 1042 is a federal regulation, and not a federal statute, "rules of statutory construction also govern the interpretation of administrative regulations." *Resnik v. Swartz*, 303 F.3d 147, 152 (2d Cir. 2002). *See also Nature v. United States*, 250 F.Supp.3d 634, 639 (E.D. Cal. 2017) (noting that "[c]anons of statutory construction are regularly applied to administrative regulations").

often takes notes when doing so.  The Court then consults its notes when making its decision on the motion.  While the transcripts and affidavits are properly regarded as "evidence" that the Court "used" in making its determination, no one could reasonably contend that the Court's own notes were "evidence" that the Court so "used."  The worksheets seem to play roughly the same role as the Court's notes and thus, like the Court's notes, they may not reasonably be regarded as "evidence" that Medicare contractors "use" in making overpayment determinations.  Accordingly, Section 1042 did not require that the worksheets be included in the administrative record.

5

For all of these reasons, neither Section 921 nor Section 1042 required the ALJ to obtain AdvanceMed's audit scoring worksheets and to include those worksheets in the administrative record.  And because the ALJ was not under any obligation to obtain the worksheets, there was no basis for the ALJ to grant General Medicine an adverse inference related to those documents.  General Medicine is therefore not entitled to relief related to the unproduced worksheets.

B

General Medicine next argues that the ALJ erred when he "improperly allowed extrapolation of the overpayment determination." (General Medicine Mot., ECF No. 14, PageID.13408.)  The Court again disagrees.

15

**1**

Because the volume of Medicare claims is so high, a Medicare contractor could not reasonably be expected to review every single claim submitted by a provider when conducting an audit. Contractors are therefore allowed to extrapolate audit results under some circumstances.

Here is how that process works. When a Medicare contractor conducts a "post-payment audit" of a provider, the contractor "review[s] a random sample of a provider's Medicare claims" in order to determine whether the provider's billings "are medically necessary and meet the requirements of the Medicare program." *General Medicine, P.C.*, 963 F.3d at 519. As part of that process, the contractor "calculate[s] an error rate based on the review. If there is a sustained or high level of payment error, the [Medicare] contractor will extrapolate that error rate over the provider's total Medicare claims to determine a total amount of overpayment." *Id.*

That is what happened here. As described above, AdvanceMed first conducted a review of 90 randomly-selected claims for services that General Medicine provided to Medicare beneficiaries in Louisiana from January 1, 2004, through April 30, 2006. (*See* ALJ Dec., ECF No. 13, PageID.377.) It then determined that General Medicine was overpaid on 91% of those claims. (*See* Admin. R., ECF No. 13-1, PageID.1736.) Based on that high rate of error, AdvanceMed concluded that it was authorized to extrapolate that rate of error across

16

all of General Medicine's claims at issue.  The "extrapolation of the statistical sampling of the overpaid claims resulted in an overpayment demand amount of $804,653.00." (*See* 2/22/2010 AdvanceMed Ltr., ECF No. 13-1, PageID.1378; ALJ Dec., ECF No. 13, PageID.377.)

**2**

Before the ALJ, General Medicine argued that AdvanceMed was not authorized to conduct that extrapolation. (*See* General Medicine ALJ Mot., ECF No. 13, PageID.712-713.)  General Medicine acknowledged that the Medicare statutes "permit[] the use of extrapolation to determine an overpayment [amount]," but General Medicine noted that "there are limits" to the use of that process. (*Id.*, PageID.712.)

General Medicine highlighted the limitation found at 42 U.S.C. § 1395ddd(f)(3) ("Section 1395ddd").  In relevant part, Section 1395ddd provides that:

> A Medicare contractor may not use extrapolation to determine overpayment amounts to be recovered by recoupment, offset, or otherwise unless the Secretary determines that –
>
> (A) There is a sustained or high level of payment error.

42 U.S.C. § 1395ddd(f)(3)(A).

General Medicine argued to the ALJ that that under this plain language, a Medicare contractor may not use extrapolation unless and until *the Secretary* first

determines that there has been a sustained or high level of payment error. (*See* General Medicine ALJ Mot., ECF No. 13, PageID.712.) General Medicine insisted that the Medicare contractor, itself, was not permitted to make that determination. General Medicine argued that the extrapolation that AdvanceMed conducted here was therefore invalid under Section 1395ddd because the Secretary never found that there was a sustained or high level of payment error; instead, AdvanceMed itself made that determination.

The ALJ disagreed. He concluded that "it was proper for AdvanceMed to make a finding of a sustained or high level of payment error," and he therefore held that AdvanceMed's use of extrapolation did not violate Section 1395ddd. (ALJ Dec., ECF No. 13, PageID.393.)

**3**

In this Court, General Medicine renews its argument that AdvanceMed was not authorized to make the determination as to whether there had been a "sustained or high level of payment error." General Medicine again insists that under Section 1395ddd, that determination must be made by the Secretary. This is a very serious argument, but the Court respectfully disagrees with it.

General Medicine's argument does not sufficiently account for a second relevant Medicare statutory provision: 42 U.S.C. § 1395kk(a) ("Section 1395kk"). In relevant part, Section 1395kk states: "[e]xcept as otherwise provided … the

18

insurance programs established by this subchapter shall be administered by the Secretary.  The Secretary may perform *any of his functions* under this subchapter directly, *or by contract* … as the Secretary may deem necessary." 42 U.S.C. § 1395kk(a) (emphasis added).  In other words, unless otherwise provided by statute, the Secretary may delegate to a contractor *any* of his administrative duties under subchapter XVIII of the Social Security Act (*i.e.*, the subchapter that establishes Medicare).  Section 1395kk thus gives the Secretary "broad authority to subdelegate [his] responsibilities in the administration of the Medicare program to contractors." *Gentiva Healthcare Corp. v. Sebelius*, 857 F.Supp.2d 1, 7 (D.D.C. 2012), *aff'd*, 723 F.3d 292 (D.C. Cir. 2013).[4]

Here, Section 1395kk authorized the Secretary to delegate to AdvanceMed the task of determining under Section 1395ddd whether there had been "a sustained or high level of payment error."[5]  Section 1395kk permitted that delegation because

---

[4] The Court recognizes that *Gentiva* was decided pursuant to the framework established in *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and as such, the court in *Gentiva* afforded deference to the Secretary's interpretation of Sections 1395kk and 1395ddd.  The Court further recognizes that the *Chevron* framework – and the deference it requires – is no longer viable. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).  Here, the Court does not defer to the interpretations of Section 1395kk and Section 1395ddd offered by the Secretary.  Instead, the Court has conducted its own independent review of those provisions.

[5] General Medicine does not dispute that the Secretary in fact delegated this task to AdvanceMed through its contract with AdvanceMed.  Instead, General Medicine argues only that the delegation was impermissible.

Section 1395ddd does not "otherwise provide" that the Secretary may not delegate the task of determining whether there has been a sustained or high level of payment error. Indeed, Section 1395kk's "grant of subdelegation authority . . . is not expressly limited or even mentioned by [Section 1395ddd]." *Id.* Simply put, the Secretary lawfully delegated the task of determining whether there had been a sustained or high level of payment error because that task is not carved out of his broad delegation authority under Section 1395kk.

## 4

General Medicine resists this conclusion on several grounds. General Medicine's contentions are thoughtful. But they do not persuade the Court that the delegation here was unlawful.

### a

General Medicine first contends that Section 1395ddd *does* effectively provide that the Secretary may not delegate to the contractor conducting the audit in question the task of determining whether there has been a sustained or high level of payment error. In support of that argument, General Medicine highlights that Section 1395ddd identifies two *separate* actors – "[a] Medicare contractor" and "the Secretary" – and assigns to only one of those actors – "the Secretary" – the task of determining whether there has been a sustained or high level of payment error. General Medicine says that "[i]t is well settled that, 'where different terms are used

in a single piece of legislation, [a] court must presume that Congress intended the terms to have different meanings.'" (General Medicine Mot., ECF No. 14, PageID.13410, quoting *Recording Indus. Ass'n of Am. v. Verizon Internet Servs., Inc.*, 351 F.3d 1229, 1235 (D.C. Cir. 2003)). General Medicine concludes that because Congress distinguished between the Secretary and a Medicare contractor "in the same sentence," Congress could not have intended that a contractor would perform the role assigned to the Secretary. (*Id.*)

The problem with this argument is that, in light of Section 1395kk, the term "Secretary" is not entirely distinct from the term "Medicare contractor" in the way that General Medicine suggests. As noted above, Section 1395kk provides that the Secretary may delegate any of his functions under subchapter XVIII to a contractor. Thus, when a provision in that subchapter assigns a task to "the Secretary," it is effectively assigning the task to "the Secretary [or any contractor delegated by the Secretary]." Stated another way, Section 1395kk effectively brings properly-delegated subcontractors within the ambit of the term "Secretary" as that term is used in provisions of subchapter XVIII – including Section 1395ddd – that assign tasks to the Secretary. Thus, the terms "Secretary" and "Medicare contractor" in Section 1395ddd are not entirely distinct in the manner suggested by General Medicine, and General Medicine's reliance on the different-words-have-different-meanings canon of statutory construction must therefore fail.

21

**b**

General Medicine next contends that the broad delegation authority in Section 1395kk should not be read into Section 1395ddd because Section 1395ddd is more specific and was enacted after Section 1395kk.  But in the Court's opinion, the fact Congress enacted Section 1395ddd years after it enacted Section 1395kk sharply undercuts General Medicine's contention that Congress intended to except Section 1395ddd from the ambit of the Secretary's broad delegation powers in Section 1395kk.  At the time Congress enacted Section 1395ddd, it was presumably well aware of the Secretary's broad delegation authority under Section 1395kk. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").  And if Congress had intended to carve out from that authority the task of determining whether there had been a sustained or high level of payment error, "one would certainly have expected Congress to have explicitly prohibited subdelegation" of that task in the text of Section 1395ddd. *Gentiva*, 857 F.Supp.2d at 11.  That Congress made no express references to subdelegation in Section 1395ddd thus indicates that Congress did not intend to bar subdelegation of the determination to be made under that statute.

**c**

General Medicine next argues that allowing the Secretary to delegate to contractors the task of determining whether there has been a sustained or high level

22

of payment error would conflict with "the purpose of" Section 1395ddd. (General Medicine Mot., ECF No. 14, PageID.13410.) According to General Medicine, that purpose is to "limit the use of extrapolation." (*Id.*, PageID.13411.) General Medicine says that, contrary to that purpose, extrapolation rates will *increase* if contractors are allowed to decide whether there has been a sustained or high level of payment error justifying extrapolation. That will happen, General Medicine contends, because "Medicare contractors are paid only from amounts recovered based on a contingency percentage of the overpayment." (*Id.*) Thus, according to General Medicine, contractors are incentivized "to extrapolate in every audit to increase the amount of [their] fee." (*Id.*) General Medicine says that Congress "eliminated" that incentive "[b]y placing the decision to extrapolate in the hands of the Secretary." (*Id.*) In contrast, General Medicine concludes, "[p]ermitting [a] Medicare contractor to determine if extrapolation was warranted would effectively negate the limitation on extrapolation created by [Section 1395ddd]." (*Id.*) This, too, is a reasonable argument. But the Court respectfully disagrees with it for several reasons.

First, the argument overstates the impact of the contractor's incentive to extrapolate because the argument fails to recognize that the Secretary – whom General Medicine identifies as the only proper decision-maker when it comes to extrapolation – has a somewhat similar incentive to extrapolate. While the

Secretary's compensation is obviously not tied to the amount of Medicare overpayments recovered, the financial viability of the Medicare program overseen by the Secretary does seem to be meaningfully connected to that amount. *See* Press Release, CMS, *CMS Launches New Model to Target Wasteful, Inappropriate Services in Original Medicare*, June 27, 2025 (explaining that "[w]aste in healthcare represents up to 25% of healthcare spending in the United States" and announcing program to "safeguard[] federal taxpayer dollars" by preventing wasteful Medicare spending). To that end, the Secretary and the departments he oversees regularly tout the importance of recovering overpaid Medicare funds. *See id. See also* Press Release, CMS, *National Health Care Fraud Takedown Results in 324 Defendants Charged in Connection with Over $14.6 Billion in Alleged Fraud*, June 30, 2025 (noting that "CMS and our federal partners are united in our mission to protect the integrity of Medicare … by crushing waste, fraud, and abuse" and explaining that "[t]hrough advanced data analytics, real-time monitoring, and swift administrative action, CMS is leading the fight to protect Medicare" by recovering wrongly paid funds). Thus, the Secretary has a motivation to err on the side of extrapolation in order to root out waste and protect taxpayer funds; with respect to extrapolation he is not a detached, neutral decision-maker. Because the Secretary and Medicare contractors share, at least to some extent, an incentive to extrapolate, allowing the contractors, rather than the Secretary, to make the decision whether to extrapolate

24

should not impact the extent of extrapolation to the degree suggested by General Medicine. Stated another way, even though contractors may have a somewhat stronger incentive than the Secretary to extrapolate, the difference in respective incentives does not seem so stark as to warrant the conclusion, drawn by General Medicine, that allowing contractors, rather than the Secretary, to make the extrapolation decision would "negate" the limits Congress intended to impose on extrapolation.[6]

Second, allowing the contractors, rather than the Secretary, to make the extrapolation decision does not disturb the important *substantive* limitation on extrapolation found in Section 1395ddd. As noted above, that provision allows extrapolation only where there has been "a sustained or high level of payment error." And the Secretary has promulgated a set of procedures that directs contractors how to apply that substantive limitation and how to determine whether there has been the required level of payment error. Importantly, those procedures for implementing the substantive limitation in Section 1395ddd serve to circumscribe the use of extrapolation by contractors. As the district court in *Gentiva* explained:

---

[6] The district court in *Gentiva* observed that having the Secretary, himself, make the decision whether to extrapolate "would impose a somewhat more significant barrier to the use of this technique" than would allowing the contractor to make the decision. *Gentiva*, 857 F.Supp.2d at 9. That may be true. But for the reasons explained above, it does not necessarily follow, as General Medicine contends, that allowing the contractors to make the decision will "negate" meaningful limits on extrapolation.

> [I]t is worth emphasizing that the Secretary has not simply subdelegated her authority to Medicare contractors without providing them guidance on how that authority should be exercised. Indeed, the Secretary has laid out the procedures contractors should follow in making the "sustained or high level of payment error" determination in the Medicare Program Integrity Manual. *See* Pub. 1008–08, Trans. 114 (June 10, 2005), *available at* www.cms.hhs.gov/transmittals/downloads/R114PI.pdf Specifically, the Manual provides that a contractor may use a "variety of means" to identify the requisite level of payment error, including, for example, sample probes, information from law-enforcement investigations, provider history, and allegations of wrongdoing by current or former employees. *See id.,* Requirement No. 3734.2. In determining whether a particular provider has demonstrated a "sustained or high level of payment error," then, a contractor merely follows the procedures the Secretary has outlined.

*Gentiva*, 857 F.Supp.2d at 12. *See also Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 337 (5th Cir. 2017) (noting that CMS has "has issued two key documents that govern the use of extrapolation" including "the Medicare Program Integrity Manual, which sets out the major steps in conducting statistical sampling, and articulates a number of criteria that govern the specifics of each step in the extrapolation process") (internal punctuation omitted); *Integrity Soc. Work Servs., LCSW, LLC v. Azar*, No. 20-CV-02770, 2021 WL 4502620, at *2 (E.D.N.Y. Oct. 1, 2021) (explaining that "[t]he Medicare Program Integrity Manual provides [Medicare contractors] with guidance on determining whether 'there is a sustained or high level of payment error'" and noting that the contractor may "consult" with CMS "prior to

26

creating a statistical sample"). Because the contractors are required to adhere to the substantive limitation in Section 1395ddd and to follow the Secretary's guidance implementing that limitation, it is not obvious that, as General Medicine insists, allowing contractors to make the extrapolation decision will "negate" the congressionally-mandated limitation on extrapolation.

Third, allowing the Secretary to delegate to contractors the decision whether to extrapolate leaves intact other important limits on extrapolation. For instance, Medicare providers may – and often do – challenge the "extrapolation methodology" used by contractors. *Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 297 (D.C. Cir. 2013).[7] The availability of these challenges is a further check against unwarranted extrapolation by contractors.

---

[7] *See, e.g., Maxmed Healthcare*, 860 F.3d at 341 (reviewing and rejecting arguments by Medicare provider challenging Medicare contractor's "sampling and extrapolation methodology"); *LivinRite, Inc. v. Azar*, 386 F.Supp.3d 644, 650 (E.D. Va. 2019) (reviewing administrative conclusion that "a valid statistical sampling methodology was used to derive through extrapolation plaintiff's total overpayment amount"); *Partners in Care, Inc. v. Kennedy*, 24-cv-00603-MC, 2025 WL 3470876, at *8 (D. Ore. Dec. 3, 2025) (rejecting argument that "statistical sampling and extrapolation performed by the [Medicare contractor] violated [plaintiff's] procedural due process rights" and noting that "[p]laintiff unquestionably had the opportunity to contest the methods of statistical sampling and extrapolation applied to its claims to "demonstrate that the overpayment determination [was] wrong") (internal quotation marks omitted).

Finally, allowing the Secretary to delegate the decision whether to extrapolate furthers a different goal of the Medicare program: the efficient review and resolution of claims for payment.  As the district court in *Gentiva* explained:

> In addition, the Secretary emphasizes that one would have to read Congress to have imposed a very significant burden on her agency in order to credit Gentiva's interpretation. "Given the size of the Medicare program," she argues, "the Secretary does not have the resources to conduct a review of payment claims for every audited Medicare provider to determine whether any particular provider has a sustained or high level of payment error." Def.'s Mot. & Opp. at 14. It is correct that requiring HHS's intervention at this preliminary stage of an audit would be strikingly inefficient given the volume of reimbursement claims. Reading § 1395ddd(f)(3) to forbid subdelegation, furthermore, would run counter to the Medicare Integrity Program's broader goal of encouraging reliance on Medicare contractors in the audit context.

> Indeed, the Secretary has delegated to Medicare contractors essentially all functions related to initial payment determinations, audits, and even the preliminary stages of dispute resolution. *See* 42 C.F.R. § 421.100; *see also Schweiker*, 690 F.2d 932, 943 (D.C.Cir.1982). While contractors have played a larger role in the administration of the Medicare program since the institution of the MIP, private parties have been involved with the Medicare reimbursement process since the program's inception. *See, e.g., id.* § 1395h(a) (authorizing Medicare contractors, referred to as "intermediaries," to perform processing and payment functions for Part A); *id.,* § 1395u(a) (authorizing contractors, referred to as "carriers," to perform processing and payment functions for Part B). Against this backdrop and in light of § 1395kk, one would certainly have expected Congress to have explicitly prohibited subdelegation had it intended that a particular portion of the audit process be performable only by agency officials.

28

*Gentiva*, 857 F.Supp.2d at 10–11.

For all of these reasons, the Court is satisfied that its reading of Section 1395ddd – as allowing the Secretary to delegate the decision whether to extrapolate – does not negate Congress' purpose to limit extrapolation and is consistent with Congress' broader goal of enhancing the efficiency of the Medicare program.

## C

Next, General Medicine argues that "the ALJ misinterpreted the [Medicare Processing Manual]" and wrongly denied payment for what are known as "split/shared visits." (General Medicine Mot., ECF No. 14, PageID.13416-13417.) According to General Medicine, "[a] split (or shared) visit is an evaluation and management [] visit in the facility setting that is performed in part by both a physician and a nonphysician practitioner (NPP) who are in the same group, in accordance with applicable law and regulations such that the service could be billed by either the physician or NPP." (*Id.*, PageID.13416 (quoting Medicare Processing Manual § 30.6.18(A), ECF No. 14-2, PageID.13454).) General Medicine argues that Section 30.6.13 of the Medicare Processing Manual allows for payments for such split/shared visits. It therefore insists that the "ALJ erred as a matter of law" when he denied payments for services rendered during those visits. (*Id.*, PageID.13417.)

In response, the Secretary says that General Medicine relies on the wrong version of the Medicare Processing Manual. The Secretary points out that while the

*current* version of the manual may allow for the payment of such split/shared visits, the version of the manual that applied at the time of the services rendered here did not. (*See* Secretary Mot., ECF No. 16, PageID.13481.) General Medicine did not respond to that argument in its reply brief. (*See generally* General Medicine's Reply Br., ECF No. 17.) Nor has General Medicine (1) explained how the version of the manual that applied at the time that the services were rendered here supported billing for the split/shared visits or (2) provided any authority for the proposition that the current version of the manual may be applied retroactively.

For all of these reasons, the Court concludes that General Medicine is not entitled to relief on this claim of error.

## D

General Medicine next argues that the ALJ erred when he rejected payment for certain services provided by nurse practitioners because "all claims relating to billing for nurse practitioner services during the subject period" should be paid based on the doctrine of *res judicata*. (General Medicine Mot., ECF No. 14, PageID.13417-13421.) The Court disagrees.

## 1

General Medicine's *res judicata* argument proceeds as follows. General Medicine says that in 2003, a woman named Denise Hubbard "sued General Medicine in a False Claims Act *qui tam* suit in which she alleged claims based on,

among other things, billing for services performed by nurse practitioners at physician rates." (*Id.*, PageID.13417.) General Medicine further says that "the United States eventually took over [that] case and entered into a settlement agreement" with General Medicine. (*Id.*, PageID.13418.) Based on that settlement, in 2010, the Hubbard case was "dismissed against General Medicine with prejudice." (*Id.*) General Medicine insists that "CMS's attempt to recoup funds here on claims arising from nurse practitioner services is *res judicata* as those claims could and should have been part of the then-pending False Claims Act case." (*Id.*)

General Medicine raised this argument before the ALJ, and he rejected it on several grounds. He concluded, among other things, that the claims in the Hubbard case "are not the same claims in the instant case, as the [] allegations [in the Hubbard case were] for the period of April 2002 to March 2003, and the claims at issue in the instant appeal are for services provided for the period of January 1, 2004 through April 30, 2006." (ALJ Dec., ECF No. 13, PageID.396.) Therefore, because the claims were not the same in the two cases, the ALJ concluded that *res judicata* did not apply here. (*See id.*)

**2**

The Sixth Circuit has described the application of federal claim preclusion (also called "*res judicata*") as follows:

31

> Claim preclusion is the doctrine by which a final judgment on the merits in an action precludes a party from bringing a subsequent lawsuit on the same claim or raising a new defense to defeat a prior judgment. It precludes not only relitigating a claim previously adjudicated; it also precludes litigating a claim or defense that should have been raised, but was not, in the prior suit. Claim preclusion only arises, however, in the presence of the following four elements: (1) where the prior decision was a final decision on the merits; (2) where the present action is between the same parties or their privies as those to the prior action; (3) where the claim in a present action should have been litigated in the prior action; and (4) where an identity exists between the prior and present actions.

*Mitchell v. Chapman*, 343 F.3d 811, 819 (6th Cir. 2003) (internal citations omitted).

**3**

The Court concludes that the ALJ properly rejected General Medicine's *res judicata* argument. As the ALJ correctly explained, the services at issue in the Hubbard *qui tam* litigation pre-dated the services in this case by several years, and General Medicine has not provided any evidence that the claims at issue here were ever part of the Hubbard litigation. While General Medicine argues that the nurse-practitioner claims at issue here could have and should have been litigated in the Hubbard case, General Medicine has not identified any authority that required the Government to amend the pleadings in that case to raise claims of alleged misconduct that occurred years after the filing of the Complaint and that involved different nurse practitioners providing services to different patients. Nor did General Medicine provide any response in its reply brief to the Secretary's arguments that

32

General Medicine was not entitled to relief on its *res judicata* arguments. (*See generally* General Medicine's Reply Br., ECF No. 17.)

For all of these reasons, the Court declines to grant General Medicine relief based on *res judicata*.

**E**

Finally, the Court turns to General Medicine's argument that the ALJ erred when he upheld AdvanceMed's decision to deny certain claims for payment in whole or in part on the basis of "missing or incomplete information." (ALJ Dec., ECF No. 13, PageID.392.) General Medicine says that the ALJ should have excused its failure to provide the information/documents in question because the materials were destroyed by a fire spawned by Hurricane Katrina.

General Medicine's argument proceeded as follows: (1) On September 6, 2005, CMS issued a "Fact Sheet" that provided that where a health care provider could not "comply with [Medicare's] normal program requirements because of Hurricane Katrina," the provider would "be exempt from sanctions for noncompliance," (2) General Medicine could not provide more fulsome records for at least some of its patients because those records were destroyed in a fire during Hurricane Katrina, and (3) therefore, General Medicine's failure to provide those records should be excused. (*Id.*) In support of that argument, General Medicine says that (1) it provided the ALJ "a letter from the nursing home [where the patients at

33

issue lived] saying that the documentation had been destroyed in a fire" and (2) its witness before the ALJ testified that "the fire was contemporaneous with Hurricane Katrina." (General Medicine Mot., ECF No. 14, PageID.13424.)  "Under [those] circumstances," General Medicine insists, it "is entitled to payment of the claims at issue." (*Id.*)

The ALJ disagreed.  He concluded that General Medicine had not submitted sufficient evidence that the records at issue were actually destroyed by Hurricane Katrina. (*See* ALJ Dec., ECF No. 13, PageID.392.)  The Court concludes that the ALJ's determination is supported by substantial evidence.

First, the letter provided by the nursing home at issue never mentioned Hurricane Katrina. (*See* Ltr., ECF No. 13-4, PageID.4186.)  It said only that the records were destroyed in a fire. (*See id.*)  It did not say when the fire occurred, nor did it say that the fire was caused by, or was the result of, Hurricane Katrina. (*See id.*)  Therefore, the nursing home letter provides no evidence that Hurricane Katrina destroyed the records at issue.

Second, the Court is not persuaded that the ALJ erred in his evaluation of General Medicine's witness who testified about the destruction of the records.  That witness' testimony was, at best, equivocal and uncertain about precisely when the fire occurred.  The witness said that his "recollection was [] that there was a fire in the storage building contemporaneous with Hurricane Katrina" and that he

34

"th[ought] it was contemporaneous" with Katrina. (Admin. R., ECF No. 13-18, PageID.13380.)  But the witness also testified that he was not "100-percent certain" when the fire occurred. (*Id.*)  The testimony General Medicine offered simply was not specific or definite enough to compel the conclusion that the records here were destroyed as a result of Hurricane Katrina.

For all of these reasons, the ALJ's decision not to grant relief based on the destroyed records is supported by substantial evidence.

V

For all of the reasons explained above, the Court concludes that General Medicine is not entitled to relief from the ALJ's decision.  The Court therefore **DENIES** General Medicine's motion for summary judgment (ECF No. 14) and **GRANTS** the Secretary's motion for summary judgment (ECF No. 16).

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  February 17, 2026

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 17, 2026, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126